IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TAMARA HANGSLEBEN, | CV 15–53–M–DLC–JCL |
| Plaintiff, | |
| vs. | FINDINGS & RECOMMENDATION |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Tamara Hangsleben brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, §§ 1381-1385.

Hangsleben protectively applied for benefits in September 2011, alleging disability since September 30, 2009 due to cervical stenosis, major depressive disorder, panic attacks, post traumatic stress disorder, and optic neuritis. (AR 138). Hangsleben's application was denied initially and on reconsideration, and

PAGE 1

Hangsleben requested a hearing. (AR 164-82; 189-90; 213-14). Hangsleben

appeared with counsel at her administrative hearing, and in May 2013 the ALJ

issued a decision denying Hangsleben's application for benefits and finding that

she was not disabled within the meaning of the Act. (AR 25-37; 46-96). The

Appeals Council denied Hangsleben's subsequent request for review, making the

ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 1-

6.) Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Hangsleben was 43 years old on her alleged onset date, and 46 years old at

the time of the ALJ's decision.

I.     **Standard of Review**

This Court's review is limited. The Court may set aside the Commissioner's

decision only where the decision is not supported by substantial evidence or where

the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1

(9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in

medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d

1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II.   Burden of Proof

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20

PAGE 3

C.F.R. § 404.1520(a)(4)(I).  If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled.  20 C.F.R. § 404.1520(a)(iii).  If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).

## III.  **Discussion**

Following the steps in the sequential evaluation process, the ALJ first found that Hangsleben met the insured status requirements of the Act through June 30, 2010, and had not engaged in substantial gainful activity since her alleged onset date.  (AR 27).   The ALJ found at step two that Hangsleben had the following

severe impairments: degenerative disc disease, affective disorder, anxiety disorder, and Tourette's syndrome.  (AR 27).  At step three, the ALJ determined that Hangsleben did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments.  (AR 28).  The ALJ also found that while Hangsleben's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence, and limiting effects" of those symptoms were not entirely credible. (AR 30).  The ALJ next determined that Hangsleben retained the residual functional capacity to perform a limited range of light work.  (AR 29).  Although the ALJ found that Hangsleben was not capable of performing her past relevant work, she concluded there were a significant number of jobs in the national economy that Hangsleben could perform, including work as a small products assembler, cannery worker, or laundry folder. (AR 36).

## A.     Medical Opinions

Hangsleben argues the ALJ erred by discounting the opinions of  treating physician Dr. Jodi Ready and examining psychologist Dr. Bryce McCollum.

A treating physician's opinion is entitled to greater weight than that of an examining or reviewing physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.

1995). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(c)(2).

If the opinion of a treating physician is uncontradicted, an ALJ must give "clear and convincing" reasons to reject the opinion. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Similar standards apply to the ALJ's evaluation of an examining physician's opinion. *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006).

### 1. Dr. Jodi Ready

Hangsleben established care with Dr. Jodi Ready in January 2011, and saw her many times over the next two years for a variety of ailments including thyroid problems and spinal stenosis. (Tr. 675-84, 700, 906-09, 1039-1109). In July 2012, Hangsleben saw Dr. Ready for dental pain and fatigue and to get some paperwork filled out. (AR 1060). Dr. Ready wrote that she did not think Hangsleben "can work at all right now with her current situation and symptoms." (AR 1061). Dr. Ready also completed a functional capacities assessment form on which she

indicated by check-mark that Hangsleben's work function was impaired and she could lift a maximum of 15 pounds, and frequently lift or carry only two pounds. (AR 906-07). Hangsleben argues the ALJ did not provide specific and legitimate reasons for discounting Dr. Ready's opinion, and erred by not incorporating those lifting and carrying restrictions into the residual functional capacity assessment.[1]

The ALJ gave little weight to Dr. Ready's statement that Hangsleben was unable to work little weight for two reasons: (1) it was not supported by the objective medical evidence, and; (2) it was not supported by her treatment notes. (AR 31). The ALJ provided a detailed summary of the medical records, including Dr. Ready's treatment notes. (AR 30-25). The ALJ noted that when Hangsleben established care with Dr. Ready in January 2011, she described having quit her job due to panic attacks and said that her boss was abusive, but also reported that her existing prescription for Celexa improved her mood. (AR 30, 1080-82). Dr. Ready found based on her examination that Hangsleben's depression and anxiety "seemed to be underlying everything," including her physical complaints, and

---

[1] Because Dr. Ready's opinion was contradicted by that of the state agency reviewing physician, the ALJ could reject it for specific and legitimate reasons. *See e.g. Bray v. Commissioner of Social Security Administration*, 554 F.3d 1219, 1228 n. 8 (9th Cir. 2009); *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 (9th Cir. 2006).

recommended that she pursue mental health treatment and physical therapy. (AR 1083). In May 2011, Hangsleben told Dr. Ready that she had received some temporary benefit from physical therapy and said she had been walking between one and two miles each day for exercise. (AR 31, 677). Dr. Ready noted that a repeat MRI looked better. (AR 677). Hangsleben saw Dr. Ready for a bee sting in September 2011, at which time she reported walking three miles daily, three days a week, and five miles twice every week. (AR 31, 1074).

In July 2012, Hangsleben complained of fatigue, which Dr. Ready attributed to anemia, depression, or her recent parotidectomy. (AR 31, 1060-61). Dr. Ready's physical examination findings were unremarkable, and reflected that Hangsleben was well nourished, appeared healthy, was in no distress, moved comfortably, and had a mild head tremor. (AR 1061).

The ALJ reasonably found that the objective findings and Dr. Ready's treatment notes, including her observations during the July 10, 2012, visit, did not support her statement that Hangsleben could not work. *See e.g. Carmickle v. Comm'r of Soc. Sec. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

The ALJ rejected Dr. Ready's opinion as set forth on the functional capacities assessment form for essentially the same reasons. The ALJ further

PAGE 8

found that Dr. Ready's opinion was entitled to little weight because the form did not include space for Dr. Ready to explain the basis for her opinion. (AR 35). This too was a permissible basis for rejecting Dr. Ready's opinion. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (the ALJ may reject a treating physician's opinion if it is "brief, conclusory, and inadequately supported by clinical findings").

The Court concludes the ALJ provided sufficiently specific and legitimate reasons for rejecting Dr. Ready's opinions regarding Hangsleben's functional capacity and ability to work.

### 2. Dr. McCollum

Hangsleben next maintains the ALJ erred by not giving more weight to the opinion of examining psychologist Dr. Bryce McCollum, who evaluated Hangsleben in July 2011 and diagnosed her with a cognitive disorder, major depressive disorder, generalized anxiety disorder, and a panic disorder without agoraphobia. (AR 630-52). Dr. McCollum found that Hangsleben had marked limitations in several categories relating to cognitive and social functioning, including the ability to learn new tasks, exercise judgment, relate appropriately to co-workers and supervisors, and interact appropriately in public contacts. (AR 633).

The ALJ considered Dr. McCollum's opinion and gave it some weight, but did not accept that Hangsleben's mental impairments caused marked limitations.[2] The ALJ discounted that aspect of Dr. McCollum's opinion because the text of his written report did not support the marked limitations he identified in the check-the-box portion of the form. (AR 35, 630-57). As the ALJ noted, for example, Dr. McCollum's written report reflects that Hangsleben was fully oriented, could perform mental multiplication, read letters and words, perform a three-step commands, and her judgment and problem solving abilities for simple circumstances were intact. (AR 35, 641-46).

The ALJ further found that the longitudinal record as a whole did not support such extreme functional limitations. (AR 35). This was a fair reading of the record, which reflected that Hangsleben had severe mental impairments with symptoms that waxed and waned, but were reasonably controlled on medication and with therapy. As ALJ noted, for example, examining psychologist Dr. Kari Heistand found that Hangsleben's depression and PTSD symptoms were under reasonable control with medication and therapy. (AR 31, 727). The ALJ permissibly found based on his review of the record as whole, including the

_____

[2]  Because Dr. McCollum's opinion was contradicted by that of the state agency physician, the ALJ could reject it for specific and legitimate reasons.

PAGE 10

opinions of examining psychologist Dr. Kari Heistand and the state agency physician, that Hangsleben's restrictions in activities of daily living, social functioning, and concentration, persistence, or pace were moderate rather than marked.

### 3.    Dr. Van Dam

Hangsleben argues the ALJ erred by saying he was giving great weight to the opinion of state agency reviewing physician Dr. Carla Van Dam, but then failing to incorporate all of the limitations set forth in that opinion.  In particular, Hangsleben maintains the ALJ failed to account for the fact that Dr. Van Dam found she had moderate limitations in the ability to maintain attention and concentration for extended periods and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (AR 149).   In light of Dr. Van Dam's findings, Hangsleben argues the ALJ erred by failing to incorporate any work attendance deficits into the residual capacity assessment finding.

But Dr. Van Dam did not specifically opine that Hanglesben would be absent from work with any regularity.  She simply indicated that Hangsleben might have "occasional lapses in concentration and work attendance when

depressive symptoms worsen." (Ar 149). Review of the ALJ's decision reflects that he did in fact include limitations that adequately accounted for Dr. Van Dam's opinion, read in its entirety. The ALJ noted that according to Dr. Van Dam, Hangsleben was nonetheless capable of performing simple one to three-step commands, with only occasional lapses in concentration. Dr. Van Dam also indicated that Hanglseben was capable of maintaining basic interaction with coworkers and supervisors. (AR 33, 148-50).

The ALJ incorporated the following mental limitations into the residual functional capacity assessment: "performing simple, routine tasks involving simple work-related decisions with few changes to the work setting. She should have only occasional, brief interactions with coworkers and the public. She should have no 'over the shoulder' supervision." (AR 29). These limitations sufficiently accounted for Dr. Van Dam's opinion.

## B. Credibility

Hangsleben argues the ALJ did not provide sufficiently clear and convincing reasons for finding her subjective testimony only partially credible.

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). At the first step, "the ALJ must

determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter*, 504 F.3d at 1036 (internal quotation marks and citations omitted). Where, as here, the ALJ finds the claimant has met this evidentiary threshold and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). The ALJ's findings "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" *Brown-Hunter*, 806 F.3d 493 (*quoting Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).

The ALJ began with a brief summary of Hangsleben's testimony, noting that she claimed she could not work due to severe neck pain and shaking. (AR 30. 54-55). Hangsleben testified that her emotional state was unpredictable, and said she has "little" panic attacks every day and "big ones" every two weeks. (AR 30,

PAGE 13

64, 75).

The ALJ considered Hangsleben's subjective testimony, but found her less than entirely believable in part because the medical evidence did not support her allegations of debilitating limitations. (AR 30 ). For example, while Hangsleben alleged she could not work due to neck tremors, records from Dr. Ready reflected that her neck tremors responded well to Resperidone. (Ar 30, 681).

The ALJ also discounted Hangsleben's testimony because she reported engaging in daily activities that were not consistent with her allegations of disabling limitations. (AR 31). Of particular significance to the ALJ was the fact that in September 2011, Hangsleben reported walking three miles a day three times a week and five miles a day twice a week. (AR 31). The ALJ reasonably found the fact that Hangsleben could walk such distances undermined her testimony that she suffered from disabling neck pain. (AR 31).

The ALJ next found the fact that Hangsleben did not always follow her doctor's treatment recommendations called her credibility into question. The ALJ noted that Hangsleben had missed multiple therapy sessions for such reasons as having medical appointments scheduled at the same time or visiting her father, despite the fact that Dr. Heistand recommended she attend more frequently. (AR 32, 840). The ALJ permissibly found the fact that Hangslegen did not prioritize

her mental health treatment suggested her mental health impairments were not as severe as alleged and called her credibility into question. See *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (an unexplained or inadequately explained failure to follow a prescribed course of treatment is a relevant factor in assessing credibility).

Finally, the ALJ found the fact that Hangsleben was attending school to become a certified nurse's aide and would soon be licensed, while also attending therapy, suggested her symptoms were not as severe as alleged. (AR 33).

Reading the ALJ's decision as a whole, the Court is satisfied that he cited sufficiently clear and convincing reasons in support of his adverse credibility determination.

### C. Residual Functional Capacity

#### 1. Concentration, persistence, or pace

The ALJ found that Hangsleben had moderate difficulties with concentration, persistence, or pace. (AR 29). Hangsleben argues the ALJ's residual functional capacity finding limiting her to simple, routine tasks does not adequately account for the functional limitations that would result from moderate difficulties with concentration, persistence, or pace.

For purposes of rating the severity of Hangsleben's mental impairments at

steps two and three of the sequential evaluation process, the ALJ found that

Hangsleben had moderate difficulties with concentration, persistence, or pace.

Because steps two and three are screening tools designed to efficiently resolve

claims where a preliminary review of the evidence reveals the claimant lies at one

of the extreme ends of the disability spectrum, the Commissioner argues this

limitation was not actually part of the ALJ's residual functional capacity

assessment at steps four and five.  *See* SSR 96-8p, 1996 WL 374184 at *4 (stating

that the "adjudicator must remember that the limitations identified in the

'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used

to rate the severity of mental impairment(s) at steps 2 and 3").

The ALJ specifically mentioned this, noting that "[t]he limitations identified

in the 'paragraph B' criteria are not a residual functional capacity assessment but

are used to rate the severity of mental impairments at steps 2 and 3 of the

sequential evaluation process."  (AR 29).  In making that residual functional

capacity assessment at step four, the ALJ specifically incorporated the opinion of

state agency reviewing physician Dr. Van Dam.   (AR 33).  Dr. Van Dam similarly

indicated that Hangsleben had moderate difficulties in maintaining concentration,

persistence, or pace.  This aspect of Dr. Van Dam's opinion goes to the medical

severity of Hangsleben's condition and was not a functional capacity evaluation.

In the functional capacity evaluation, Dr Van Dam indicated that Hangsleben could carry out very short simple instructions, sustain an ordinary routine, make simple work-related decisions, and "perform routine, simple, one-three step instructions consistently." (AR 145, 149). Consistent with Dr. Van Dam's opinion, the ALJ's residual functional capacity assessment states that Hangsleben "is limited to performing simple, routine tasks involving simple work-related decisions with few changes to the work setting." (AR 29).

The Ninth Circuit has held that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Stubbs-Danielson*, 539 F.3d at 1174 (*citing Howard v. Massasnari*, 255 F.3d 577, 582 (9th Cir. 2001) ("the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [the claimant's] deficiencies in concentration, persistence, or pace" where the state agency psychologist found claimant was able to perform simple, repetitive, routine activities).

In *Sabin v. Astrue*, 337 Fed. Appx. 617, 620 2009 WL 2013526 *2 (9th Cir. 2009)(unpublished), the claimant argued that although "the ALJ found she had moderate difficulties in concentration, persistence or pace," he failed to account

for those limitations in the residual functional capacity finding.  The Ninth Circuit

disagreed, concluding that the ALJ appropriately "determined the end result of

[the claimant's] moderate difficulties as to concentration, persistence, or pace was

that she could do simple and repetitive tasks on a consistent basis." *Sabin*, 337

Fed. Appx. at 621.

Hangsleben relies on *Brink v. Commissioner*, 343 Fed. Appx. 211, 212  (9th

Cir. 2009)(unpublished) for the proposition that "simple repetitive work" does not

adequately capture limitations in concentration, persistence or pace.  But *Brink* did

not consider whether there was evidence the claimant was capable of simple

routine tasks.

Here,  Dr. Van Dam found that although Hangsleben had moderate

difficulties with concentration, persistence, or pace, she was still capable of

simple, repetitive, routine tasks. (AR 145-46, 149).  The ALJ adequately

accounted for Hangsleben's moderate difficulties with concentration, persistence,

or pace by limiting her to work with simple, routine tasks involving simple work-

related decisions.

2.    Manipulative limitations

Hangsleben next argues the ALJ erred by not including any manipulative

limitations with handling or fingering because nerve conduction testing was consistent with carpal tunnel syndrome (AR 1114-16) and she testified that she has difficulty using her hands to play the piano. (AR 72). Hangsleben maintains this omission was prejudicial because the three jobs identified by the vocational expert all require significant reaching, handling, and fingering.

But Hangsleben does not point to any medical evidence that she had any manipulative limitations due to carpal tunnel syndrome. And because the ALJ provided sufficiently clear and convincing reasons for finding Hangsleben only partially credible, she was not required to accept all of the limitations to which she testified. The fact that rest results from October 2011 were consistent with carpal tunnel syndrome is not enough, on its own, to establish that Hangsleben had manipulative limitations that would significantly interfere with her ability to perform work-related tasks.

### 3. Medication side effects

Hangsleben also maintains the ALJ erred by not including limitations to account for the side effects of her medications. Hangsleben testified that the Klonopin she takes "knocks her out" for 11 hours and makes her very tired and "dopey" the next day. (AR 65, 67-68, 75). Hangsleben argues the ALJ erred by not accounting for these side effects when assessing her residual functional

capacity.  But because the ALJ provided sufficiently clear and convincing reasons

for finding Hangsleben only partially credible, he was not required to accept all of

the limitations to which she testified.  Hangsleben does not point to any medical

records suggesting that her medications caused side effects so severe that they

would interfere with her ability to work.

### D.    Vocational Expert

Hangsleben contends the ALJ failed to obtain, inquire, or identify and

resolve potential  conflicts between her testimony and the job descriptions set

forth in the Dictionary of Occupational Titles (DOT).  SSR 00-4p governs the use

of vocational expert evidence in disability determinations, and states that

"[o]ccupational evidence provided by a VE...generally should be consistent with

the occupational information supplied by the DOT."  SSR 00-4p, * 2.  If "there is

an apparent unresolved conflict between VE...evidence and the DOT," the ALJ

"must elicit a reasonable explanation for the conflict before relying on the VE"

testimony to support a disability determination.  SSR 00-4p, *2.

Hangsleben contends a restriction to simple routine tasks is not consistent

with the jobs the vocational expert testified she could perform, all of which have a

Specific Vocational Preparation (SVP) of 2, and claims the ALJ erred by not

asking the vocational expert to address that potential conflict[3].  The vocational

expert  explained that the jobs of  small products assembler, canner worker, and

laundry folder are unskilled jobs with an SVP of 2.  The vocational expert further

testified that a hypothetical individual limited to work involving simple routine

tasks involving simple work-related decisions would be able to perform those

unskilled jobs.  The ALJ specifically asked the vocational expert if her testimony

was consistent with the DOT, the vocational expert stated that it was.  (AR 89).

Hangsleben relies on *Rounds v. Commissioner*, 795 F.3d 1177, 183 (9th Cir.

2015) for the proposition that there is a conflict between jobs with a SVP 2 and a

limitation to simple routine work.  But unlike Hangsleben, the claimant in *Rounds*

was limited to "one to two step tasks."  Here, the ALJ permissibly relied on the

vocational expert's testimony that a hypothetical person capable of simple routine

tasks could perform unskilled work with a SVP 2.

Finally, Hangsleben contends the ALJ failed to ask the vocational expert

about a potential conflict between the reaching requirements of the three jobs she

identified and Hangslegen's residual functional capacity.   The ALJ's residual

---

[3]SVP levels measure the skill level necessary to perform a particular job.
Unskilled work corresponds to an SVP level of 1-2, semi-skilled work corresponds
to an SVE level of 3-4, and skilled work corresponds to an SVP level of 5-9.  SSR 00-
4p, 2000 WL 1898704, *3 (Dec. 4, 2000).

functional capacity finding included a limitation to "occasional reaching overhead bi-laterally." (AR 29). As defined in the DOT, the jobs of small products assembler and cannery worker require "constant reaching," and the laundry folder job requires "frequent reaching." DOT 739.687-030; DOT 529.686-014, DOT 369.687-018.

The DOT does not distinguish between overhead reaching, or reaching in other directions. Thus, the fact that a job involves reaching does not not necessarily mean that it involves overhead reaching. The ALJ did what was required of her – she asked the vocational expert whether her testimony was consistent with the DOT. The vocational expert responded that it was, and the ALJ was entitled to rely on that testimony. This is particularly where, as here, the claimant was represented by counsel who cross-examined the vocational expert but did not raise this issue. See *Sanchez v. Colvin*, 2016 WL 370687 *16-17 (C.D. Cal. Jan. 29, 2016) (holding that ALJ entitled to rely on vocational expert's testimony that claimant who was precluded from reaching over shoulder level could perform jobs described by the DOT as involving frequent reaching); *Frias v. Colvin*, 2015 WL 8492453 *7 (C.D. Cal. Dec. 10, 2015) (finding "no conflict between ALJ's RFC limitation of 'occasional overhead reaching bilaterally' and the DOT requirement of 'frequent reaching').

**IV. <u>Conclusion</u>**

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of prejudicial legal error. Therefore,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

DATED this 28th day of April, 2016

Jeremiah C. Lynch
United States Magistrate Judge