IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TAMARA HANGSLEBEN, | CV 15–053–M–DLC–JCL |
| Plaintiff, | |
| vs. | ORDER |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security | |
| Defendant. | |

United States Magistrate Judge Jeremiah C. Lynch entered his Findings and

Recommendation on April 28, 2016, recommending that the Social Security

Commissioner's decision be affirmed. Hangsleben timely filed objections and is

therefore entitled to de novo review of the Findings and Recommendation to

which she objects. 28 U.S.C. § 606(b)(1). The portions of the Findings not

specifically objected to will be reviewed for clear error. *McDonnell Douglas*

*Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1209, 1313 (9th Cir. 1981). For

the reasons given below, the Court rejects the Findings and Recommendation as

to: (1) the ALJ's discounting of Dr. McCollum's opinion; (2) the ALJ's credibility

finding; (3) the ALJ's residual functional capacity ("RFC") determination; and (4)

the ALJ's burden of resolving the conflict arising from the Vocational Expert's

testimony. The Court adopts the Findings and Recommendation regarding the ALJ's discounting of Dr. Ready's opinion and all other issues to which Hangsleben has not specifically objected. Ultimately, the Court reverses the Commissioner's decision and remands to the agency for further proceedings.

## BACKGROUND

Because the parties are familiar with the facts and procedural history of this case, they will be included here only as necessary to explain the Court's order.

Hangsleben brings this action challenging the denial of her application for disability insurance and supplemental income benefits. She alleges that she has been disabled since August 15, 2010 as a result of major depression, anxiety, post-traumatic stress disorder ("PTSD"), panic disorder, optic neuritis, cervical stenosis, carpal tunnel syndrome, hypothyroidism, a salivary gland tumor, and side effects of medications. Her primary complaints arise from her mental health issues, particularly her frequent panic attacks.

Hangsleben's last date insured was June 30, 2010, and she filed applications for Social Security Disability Insurance and Supplemental Security Income benefits on September 14, 2011. Her applications were denied initially and upon reconsideration. Assisted by counsel, she requested a hearing, which was held on May 1, 2013. On May 30, 2013, the Administrative Law Judge ("ALJ") issued an

unfavorable decision. Hangsleben filed a request for review with the Social

Security Administration ("SSA")'s Appeals Council, which was denied. She then

filed a civil action in this Court. Upon review of the administrative proceedings,

Judge Lynch recommended the Commissioner's decision be affirmed. Hangsleben

timely objected.

## STANDARD OF REVIEW

This Court applies a deferential standard of review to the Social Security

Administration's decision, focusing on procedural rather than substantive issues.

The Court must affirm the decision if it is "supported by substantial evidence, and

if the Commissioner applied the correct legal standards." *Batson v. Comm'r of*

*Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). The Court draws

inferences in favor of the Commissioner, deferring to the Commissioner's decision

"if evidence exists to support more than one rational interpretation." *Id.*

## DISCUSSION

Following the five-step sequential process required under the federal

regulations implementing the Social Security Act, the ALJ determined that

Hangsleben is not disabled. *See* 20 C.F.R. § 404.1520(a).

Hangsleben raises the following objections: (1) the ALJ did not articulate

specific and legitimate reasons for rejecting the opinions of her treating doctors;

(2) the ALJ's finding regarding her RFC is incomplete and not supported by substantial evidence; (3) the ALJ did not obtain evidence from the vocational expert to explain apparent conflicts between the expert's testimony and the provisions of the dictionary of occupational titles; and (4) the ALJ erred in rejecting Hangsleben's own testimony.

## I.    Treating Physicians' Opinions

Hangsleben argues that the ALJ erred in rejecting the opinion of two of her treating physicians, Drs. McCollum and Ready. Upon reviewing the ALJ's decision and the longitudinal record, the Court agrees as it relates to the opinion of Dr. McCollum.

In contrast to a non-treating physician, a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citations omitted). Thus, as a general rule, a treating physician's opinion is given more weight than that of a physician who has not personally examined the plaintiff. *Id.* However, a treating physician's opinion is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

-4-

An ALJ must give "clear and convincing" reasons to reject a treating

physician's opinion if it is uncontradicted. *Baxter v. Sulivan*, 923 F.2d 1391, 1396

(9th Cir. 1991). On the other hand, if the opinion has been contradicted by that of

another doctor, the ALJ may reject it only by providing "specific and legitimate

reasons supported by substantial evidence in the record." *Reddick v. Charter*, 157

F.3d 715, 725 (9th Cir. 1998) (citations and internal quotation marks omitted). "A

nonexamining doctor's opinion 'with nothing more" [does] not constitute

substantial evidence." *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995).

## A.    Dr. McCollum

Hangsleben argues that the ALJ failed to provide sufficient reasons for

rejecting the opinion of her treating psychologist, Bryce A. McCollum, Psy.D.

Dr. McCollum diagnosed Hangsleben with major depressive disorder, panic

disorder, PTSD, and an unclassified cognitive disorder. (AR 646.) He also

documented her Global Assessment of Functioning ("GAF")[1] as 40.[2] (AR 646.)

On an assessment form, Dr. McCollum checked boxes rating Hangsleben's limitations in cognitive and social functioning. He found that she had "marked" limitations in over half of the assessed categories, including learning new tasks, making decisions, relating to co-workers and supervisors, and behaving appropriately in public and work settings. (AR 633, 650.) He determined that her difficulty with concentration, anxiety, and panic attacks would likely present "very severe interference" with Hangsleben's ability to work. (AR 648.) Dr. McCollum represented that he had personally witnessed Hangsleben's difficulty with concentration, depressive mood, anxiety, and short-term memory deficit. (AR 631, 648.)

Dr. McCollum's medical opinion was contradicted by that of Dr. Carla van Dam, a non-examining physician employed by the state Disability Determination

---

[1] GAF is a clinical evaluation tool used to quantify the severity of mental illness. It "is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Harrison v. Colvin*, 759 F.3d 995, 1002 n. 4 (9th Cir. 2014) (citation and internal quotation marks omitted). GAF scores fall between 1 and 100, with lower scores corresponding to more severe symptoms. The DSM-IV classifies a GAF score between 31 and 40 as indicating either "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." A score between 41 and 50 indicates either "serious symptoms" or "any serious impairment in social, occupational, or school functioning." American Psychiatric Association, *DSM-IV: Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

[2] The ALJ appears to have mistakenly listed Dr. McCollum's assessment of Hangsleben's GAF as 45. (AR 34.)

Services ("DDS"). Thus, the ALJ was required to give specific and legitimate reasons supported by substantial evidence in the record to reject Dr. McCollum's opinion regarding Hangsleben's limitations. The ALJ gave two reasons for partially rejecting Dr. McCollum's opinion: (1) she determined that it was unsupported by Dr. McCollum's own objective findings; and (2) she found that it was inconsistent with the longitudinal record. The Court is cognizant of the high degree of deference it must afford the ALJ's fact-finding, but it finds no support for either of the reasons given by the ALJ.

If valid, either of the ALJ's given reasons for partially rejecting Dr. McCollum's report would be sufficient. This Court's review is procedural; if the ALJ is able to point to substantial evidence from the longitudinal record and meaningfully articulate its inconsistency with the discredited medical opinion, the Court may not second-guess the ALJ's decision. Additionally, a discrepancy between a doctor's opinion and her other observations and evaluations provides the ALJ with a "clear and convincing reason for not relying on the doctor's opinion." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). However, an ALJ may not selectively read an examining physician's notes to read inconsistency into a report. *Holohan v. Massanari*. 246 F.3d 1195, 1205 (9th Cir. 2001).

The ALJ determined that Dr. McCollum's report was internally inconsistent

and gave "partial weight" to Dr. McCollum's report, writing that "while the claimant's objective performance during Dr. McCollum's examination supports the residual functional capacity found in this decision, it does not support the level of limitation he proposes." (AR 35.) The ALJ noted that Hangsleben presented to Dr. McCollum fully oriented, capable of performing simple tasks, and displaying sufficient judgment and problem-solving. Although her speech was somewhat "tangential," she was "logical and articulate," and she reported having a social life. While the ALJ's findings initially appear credible, review of Dr. McCollum's report indicates that the ALJ read it selectively to create an inconsistency between Dr. McCollum's observations and his opinion that Hangsleben is markedly limited by her anxiety and panic disorder.

Dr. McCollum's report is consistent within itself. The ALJ culled every arguably positive finding from Dr. McCollum's report and ignored those that were consistent with Dr. McCollum's opinion that Hangsleben's social and cognitive limitations would interfere significantly with her ability to work. For example, the ALJ wrote "[s]he recalled one of three items after a five-minute delay," suggesting that this finding is inconsistent with Dr. McCollum's opinion. (AR 34.) However, in the context of Dr. McCollum's report, this finding is presented as indicative of a decline in short-term memory, supporting Dr. McCollum's opinion. (AR 641.)

-8-

Similarly, the ALJ discussed Hangsleben's ability to perform simple commands, but ignored that she could not count backward from 100 by sevens. (AR 35, 641–42.)

More importantly, Hangsleben's primary complaints involve her emotional health, not her cognitive ability. Even if the findings discussed by the ALJ called into question Dr. McCollum's assessment of Hangsleben's cognitive functioning—and they do not—they still would not implicate his description of her anxiety and panic attacks as markedly limiting her ability to work. The ALJ did not point to any evidence from Dr. McCollum's report contradicting his opinion that her panic attacks and anxiety would negatively impact Hangsleben's functioning in a work environment.

The ALJ also determined that Dr. McCollum's assessment of Hangsleben as having "marked" limitations was inconsistent with the longitudinal record, which demonstrates that although Hansgleben had severe mental impairments, she responded well to pharmacological and therapeutic interventions. The ALJ cites to the report of examining psychiatrist Dr. Kari Heistand to support her discounting of Dr. McCollum's assessment. The ALJ relied on one-half of one sentence from Dr. Heistand's report: "Client feels depression and PTSD symptoms under reasonable control with current medications and addition of therapy . . . ."

(AR 31, 727.) The ALJ downplayed several of Dr. Heistand's other findings, including her assessment of Hangsleben's GAF score as 40,[3] Hangsleben's presentation with voluminous speech and hypomanic affect, and her demonstration of "many narcissistic and histrionic traits." (AR 32, 727–28.) Further, although the ALJ discussed Hangsleben's report to Dr. Heistand that her depression and PTSD responded well to treatment, she failed to address the fact that Dr. Heistand prescribed a new medication to treat Hangsleben's anxiety and panic disorder during the very same visit. (AR 727.) Nor did the ALJ note that Dr. Heistand did not herself describe Hangsleben's symptoms as well-controlled but only wrote what Hangsleben herself told her. Finally, the ALJ failed to consider Hangsleben's later visit to Dr. Heistand, at which time Dr. Heistand assessed Hangsleben's GAF as 45 and again altered Hangsleben's medication regime by

___

[3] The ALJ wrote that she "g[a]ve little weight to the low GAF scores of record" because it is "merely a 'snapshot' estimation of the person's symptoms of that day, and it cannot show if an individual's level of symptoms have lasted for 12 continuous months." (AR 32.) She also cited to the Commissioner's comment that the GAF scale "does not have a direct correlation to the severity requirements" under the Social Security Act. (AR 32 (citing 65 Fed. Reg. 50,746, 50,764–65).) While the Court agrees that GAF scores do not correspond to a per se finding of disability, it cannot agree that the consistently low GAF scores on the record can be ignored completely, particularly when Hangsleben's GAF score has been assessed by many practitioners over the course of approximately one full calendar year. *See Garrison.* 759 F.3d at 1003 n. 4 ("Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement.").

-10-

adding aripiprazole and increasing her clonazepam[4] prescription to 30 pills

monthly. (AR 847–48.) Dr. Heistand's reports are consistent with Dr.

McCollum's medical opinion.[5]

The only other medical report that the ALJ found inconsistent with Dr.

McCollum's medical opinion was that prepared by Dr. van Dam, a non-examining

physician employed by the state. In the absence of a valid reason to discount Dr.

McCollum's opinion, Dr. van Dam's medical opinion must be given less weight

than that of Dr. McCollum, a treating physician. 20 C.F.R. § 404,1527(b)–(d). As

previously stated, Dr. van Dam's contradictory opinion allowed the ALJ to give

specific and legitimate—rather than clear and convincing—reasons before

rejecting Dr. McCollum's opinion. However, it cannot also be the only source of

the specific and legitimate reasons given to contradict the treating doctor's

opinion. *See Lester*, 81 F.3d at 832 (9th Cir. 1995).

The Court determines that the ALJ's reasons for affording partial weight to

---

[4] Clonazepam (brand name "Klonopin") is a central nervous system depressant used to treat seizures and panic disorder. Nat'l Ctr. for Biotechnology Info., *Clonazepam (by Mouth)*, NIH.gov, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009677/?report=details (last visited September 22, 2016).

[5] Hangsleben has pointed to additional evidence in the record supporting Dr. McCollum's opinion. (Doc. 17 at 7–8.) Because the Court is limited to review of the ALJ's stated reasons and finds that the stated reasons are invalid, it does not weigh all of the evidence in the record to determine the accuracy of the ALJ's findings.

Dr. McCollum's opinion are insufficient. The ALJ failed to support her findings that Dr. McCollum's medical opinion is internally inconsistent and contradicted by the longitudinal record. On remand, the ALJ must give considerable weight to Dr. McCollum's opinion.

## B. Dr. Ready

Hangsleben also argues that the ALJ failed to provide sufficient reasons for partially rejecting the medical opinions of her treating physician, Dr. Jodi Ready, M.D, regarding her physical ailments. The Court disagrees and accepts Judge Lynch's Findings and Recommendations regarding Dr. Ready's opinions.

Dr. Ready diagnosed Hangsleben with cervical spondylosis with cervical stenosis on January 2, 2012. Several months later, on a standard form issued by the Washington Department of Social and Health Services ("DSHS"), Dr. Ready assessed Hangsleben's work function as "impaired by a medically determinable physical condition." (AR 906.) She represented that Hangselben could lift a maximum of 15 pounds and that she could lift or carry 2 pounds for 2.5 to 6 hours in an 8-hour workday. (AR 906.) In her notes regarding the same visit upon which she based her assessment for DSHS, Dr. Ready remarked, "I don't think [Hangsleben] can work at all right now with her current situation and symptoms." (AR 1060–61.)

-12-

Dr. Ready's opinion was contradicted by Dr. Platter, M.D., a non-examining physician employed by the state. (AR 146–148.) Thus, the ALJ was required to give specific and legitimate reasons supported by substantial evidence in the record to reject Dr. Ready's opinion. The ALJ wrote that she accorded limited weight to Dr. Ready's opinion because she determined: (1) that it was unsupported by the longitudinal record; and (2) that it was unsupported by Dr. Ready's own treatment notes. (AR 31.)

Hangsleben argues that the ALJ erred in discounting Dr. Ready's opinion that she was unable to work. The ALJ determined that Dr. Ready's opinion was unsupported by her own treatment notes, which recorded Hangsleben's statements that she took frequent long walks and was able to perform activities of daily living requiring lifting. When Dr. Ready began treating Hangsleben in January 2011, she wrote that Hangsleben "gets shaking and pain in her neck" and that risperidone[6] "helps the neck tremors but makes her hungry." (AR 681.) Dr. Ready found that her range of motion was normal but that Hangsleben experienced pain in her right shoulder with the empty can test. (AR 684.) Dr.

---

[6] Risperidone is an antipsychotic labeled for use to "treat schizophrenia, bipolar disorder, or irritability associated with autistic disorder." Nat'l Ctr. for Biotechnology Info., *Citalopram (by Mouth)*, NIH.gov,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012012/?report=details (last visited September 22, 2016). Hangsleben was presumably prescribed risperidone off-label to treat her Tourette Syndrome.

Ready attributed the pain to a probable strain and assessed Hangseleben's depression and anxiety as "underlying everything." (AR 684.) In May 2011, Dr. Ready recorded Hangsleben's subjective report of her neck pain as "persistent" and increasing over time. (AR 677.) In September 2011, when Hangsleben sought treatment for a bee sting, Dr. Ready described Hangsleben as "moving comfortably" and wrote that Hangsleben walked three miles five days a week. (AR 1074–75.) Hangsleben returned on July 2012 because she "need[ed] paper filled out so she can keep her medical insurance." It was at this time that Dr. Ready restricted Hangsleben's lifting capacity and indicated her own concern with Hangsleben's ability to work. (AR 906–07, 1060–61.) Dr. Ready based her restrictions on Hangsleben's report of being "tired all the time" and on Hangsleben's diagnoses of cervical stenosis and tremor, noting that her conditions were "interfering with her ability to function physically." (AR 106–61.) Hangsleben visited Dr. Ready more recently, in February 2013, at which time Dr. Ready assessed Hangsleben's range of motion as "grossly normal" and noted "no joint tenderness or muscle weakness." (AR 1049–50.)

Hangsleben argues that the ALJ erred in discounting Dr. Ready's opinion that she was unable to work as unsupported by Dr. Ready's treatment notes. The Court disagrees. Dr. Ready's medical notes do not explain why Hangsleben's

condition was so severe that Dr. Ready determined she was unable to work. *See*

*Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept

the opinion of any physician, including a treating physician, if that opinion is

brief, conclusory, and inadequately supported by clinical findings."). In fact, Dr.

Ready's notes do not regularly describe Hangsleben as limited by pain or mobility

issues. Dr. Ready's medical reports do not provide an objective basis for her

opinion that Hangsleben was unable to work due to neck pain.[7] The ALJ did not

err in affording little weight to Dr. Ready's statement that she didn't "think

[Hangsleben] can work at all right now with her current situation and symptoms."

(AR 1060–61.)

Hangsleben also argues that the ALJ erred in discounting Dr. Ready's

opinion that Hangsleben is limited to frequently lifting and carrying 2 pounds and

lifting a maximum of 15 pounds. Dr. Platter agreed with Dr. Ready's diagnosis

but disagreed with her opinion about the level of restriction Hangsleben's

condition necessitated. Based on his review of the longitudinal record, Dr. Platter

found Hangsleben to be capable of occasional overhead reaching, climbing, and

---

[7] In fact, Dr. Ready's reports may be more consistent with a finding that Hangsleben
could not work due to mental illness. The Court cannot determine why Dr. Ready opined that
Hangsleben may be unable to work, demonstrating that Dr. Ready's opinion is indeed
unsupported by her medical notes.

-15-

crawling and limited to occasionally lifting 20 pounds and frequently lifting 10 pounds. (AR 147–48.) He found that Hangsleben was able to perform activities of daily living at a level exceeding her self-reported limitations. (AR 146 ("For example, she says she cannot do any lifting, yet she does laundry and g[o]es shopping.").)

The Court is not well-situated to determine whether Dr. Ready or Dr. Platter presented a more accurate picture of Hangsleben's limitations. Nor need it do so. The only question is whether the ALJ gave specific and legitimate reasons to limit the weight given to Dr. Ready's opinion. Dr. Ready's opinion is not contradicted by the longitudinal record, as there is no dispute with Dr. Ready's finding that Hangsleben suffered pain due to cervical spondylosis with cervical stenosis. (*See, e.g.,* 1118.) However, like Dr. Ready's general opinion that Hangsleben could not work, the specific limitations assessed by Dr. Ready are not adequately supported by her treatment notes and by the longitudinal record. Dr. Ready's assessment of Hangsleben's limitations appeared on a standard form issued by DSHS that left no room for her to explain her findings; nor did she set forth her basis for her opinion elsewhere in her treatment notes. The Court cannot find any indication in the record of how Dr. Ready formed her opinion.

The ALJ did not err in discounting Dr. Ready's opinion as to Hangsleben's

limitations. It is generally appropriate to give the greatest weight to a treating physician's opinion. 20 C.F.R. § 404.1527(b)–(d). On the other hand, it was appropriate in this case to discount Dr. Ready's opinion as "brief, conclusory, and inadequately supported by clinical findings." *See Thomas*, 278 F.3d at 957. The ALJ provided sufficiently specific and legitimate reasons for rejecting Dr. Ready's opinion.

## II. Credibility

The Magistrate Judge determined that the ALJ did not err in finding Hangsleben's subjective testimony only partially credible. Hangsleben objects, arguing that the ALJ gave only general and inaccurate reasons for partially rejecting her testimony.

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce" the symptoms. *Id.* (citation and internal quotation marks omitted). If the claimant meets her burden, the ALJ must then offer "specific, clear and convincing reasons" before rejecting her testimony unless there is evidence of malingering. *Id.* The ALJ must "identify

what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d 705, 722 (9th Cir. 1998). In credibility determinations, the ALJ's role is not to evaluate the general reliability of the claimant but to determine whether it is appropriate to reject specific allegations. *Holohan*, 246 F.3d at 1208.

The ALJ determined that Hangsleben met her initial burden of "present[ing] objective medical evidence of . . . underlying impairments which could reasonably be expected to produce" her alleged symptoms of severe neck pain and shaking, unpredictable emotional mental state, daily "little" panic attacks, and biweekly major panic attacks. (AR 30; *See* AR 63–64, 74–75.) Hangsleben testified that her panic disorder and anxiety were her primary problems. (AR 64.) The ALJ determined that there was no evidence of malingering. However, the ALJ wrote that the "claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible[.]" (AR 30.)

The ALJ discounted Hangsleben's testimony for the following reasons: (1) she had reported to a treating physician that medications helped improve her symptoms of depression and tremor; (2) she reported taking frequent fairly long walks, which is inconsistent with her report of disabling neck pain; (3) in early 2013, she indicated a positive outlook to her counselor, reporting that she was

studying to become a certified nursing assistant, that she would soon marry and move from Oregon to Montana, and that she had been under stress but able to calm herself down several times; and (4) she missed multiple recommended counseling sessions, suggesting "that the claimant's mental health treatment has not been a priority" and "[t]he allegedly disabling impairments are not as severe as she alleges them to be." (AR 30–33.)

The Court cannot agree that the reasons given by the ALJ are sufficiently clear and convincing to reject Hangsleben's testimony. While Hangsleben's self-reported active life may be inconsistent with her reports of neck pain, none of the reasons given refute Hangsleben's primary complaint of severe mental health disorder.

First, the ALJ erred in rejecting Hangsleben's testimony based on evidence that she responded well to medication and therapy. The ALJ cited to Dr. Ready's notes from the January 2011 visit, at which point Hangsleben told Dr. Ready that her prescribed citalopram[8] improved her mood. (AR 30, 681.) If the ALJ determined from this report that Hangsleben was not as severely impaired as she

---

[8] Citalopram (brand name "Celexa") is a selective serotonin reuptake inhibitor ("SSRI") depressant used to treat depression. Nat'l Ctr. for Biotechnology Info., *Citalopram (by Mouth)*, NIH.gov, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/?report=details (last visited September 22, 2016).

indicated, it was based on an extremely selective reading of the report. With a little more context, the notes read, "[Hangsleben] recalls not eating for a month related to depression. She feels [citalopram] has helped with her mood. She recalls several times that she used to be a model." (AR 681.) The citalopram is claimed to have helped Hangsleben's "mood," but not her anxiety or panic disorder, which Hangsleben indicated to be her primary complaints. Additionally, the report gives no suggestion that the drug's therapeutic benefits essentially make Hangsleben well; a person who is severely depressed may become less depressed but remain severely depressed. The same report indicates that Dr. Ready did not perceive Hangsleben to be well; as Dr. Ready wrote at the time, Hangsleben's depression and anxiety "seem[ed] to be underlying everything." (AR 684.) Further, Dr. Ready noted, "[Hangsleben] had to quit her job due to her panic attacks a few months ago." (AR 683.)

The ALJ also looked to a note prepared by Dr. Heistand in February 2012, at which time Hangsleben stated that she felt her "depression and PTSD symptoms [are] under reasonable control with current medications." (AR 727.) Again, the ALJ reads the record selectively. Dr. Heistand prescribed an additional medication for Hangsleben's panic and anxiety at the same visit. (AR 727.) Additionally, Dr. Heistand's notes strongly indicate that Hangsleben suffers

-20-

significantly from anxiety and panic disorder: "[Hangsleben] shares that she is mostly troubled by having a constant state of excessive energy and anxiety with panic attacks . . . . She describes having racing heart, feeling cold all over and hyperventilating . . . . She maintains some hypervigilance and an excessive startle reflex." (AR 722–23.)

The ALJ's finding that risperidone helped Hangsleben's neck tremors is similarly unconvincing. First, Dr. Ready's note gives no indication of the degree of relief afforded by risperidone: "[Hangsleben] gets shaking and pain in her neck. She was seen by neuro and r[i]sper[i]done helps the neck tremors but makes her very hungry. She takes it [as needed] and has had it for a couple of years. PT has helped in the past." (AR 681.) Second, risperidone's therapeutic effect on Hangsleben's tremor does not speak to her neck pain, let alone her primary complaints of anxiety and panic disorder.

Second, the ALJ erred in discrediting Hangsleben's subjective testimony regarding her symptoms based on her long and frequent walks. Hangsleben seeks to have her neck pain considered within lifting restrictions factored into the RFC; she has not claimed that her ability to walk is diminished due to pain. The ALJ gave no indication of why walking is inconsistent with Hangsleben's report of neck pain. However, even if Hangsleben's general level of activity was

-21-

inconsistent with her self-reported pain, it would not speak to her primary complaints of anxiety and panic disorder.

Third, the ALJ erred in discrediting Hangsleben's testimony based on her finding that Hangsleben appeared to achieve a level of success inconsistent with inability to work at some point in 2013. The ALJ cited to a treatment note prepared by Hangsleben's counselor in January 2013, in which the counselor wrote that Hangsleben was attending school to become a nursing assistant and that Hangsleben reported being able to calm herself down several times. (AR 32–33, 833.) The ALJ erred in discrediting Hangsleben's testimony on this basis for two reasons. First, particularly when a claimant's health issues are cyclical in nature, as here, the Ninth Circuit rejects the argument that a claimant is able to work because she attempted to improve her situation—"disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Second, the ALJ's finding is not supported by substantial evidence. While Hangsleben reported attending a two- to three-week-long "crash course" to become a certified nursing assistant, she did not pass the course due to her anxiety and panic disorder. In her words, she "flunked the hands on test because I was so nervous that I put TED hose on backwards and I did something else wrong." (AR 61.)

Finally, the Court also finds error in the ALJ's determination that Hangsleben's testimony should be discredited because her failure to attend scheduled appointments suggests that "she was not fully engaged in the treatment process." (AR 33.) The ALJ's finding that Hangsleben missed many scheduled appointments is supported by the record. (AR 32, 833, 840.) What is in dispute is whether Hangsleben's failure or inability to comply with her prescribed treatment plan is a legitimate reason to find that her allegations of anxiety and panic disorder are questionable.

There seems to be some question regarding whether a rule applies to make this credibility finding, if supported by evidence, either per se lawful or unlawful. In her opening brief, Hangsleben argued that failure to seek mental health treatment is indicative of mental illness, not lack of disability. The ALJ suggested that the opposite is true. The Ninth Circuit has not squarely determined whether an ALJ may discredit a plaintiff's report of mental illness for her failure to seek medical assistance. In *Chaudhry v. Astrue*, the court suggested that such a finding is permissible, although it was not dispositive to the case: "The record also reflects . . . that Chaudhry repeatedly failed to seek treatment for depression or follow prescribed courses of treatment. . . . This record evidence bolsters the ALJ's [credibility] finding." 688 F.3d 661, 672 (9th Cir. 2012). On the other hand, in

*Nguyen v. Chater*, the court determined that the ALJ erred in rejecting a medical

provider's opinion regarding a claimant's depression, citing to the Sixth Circuit

for the proposition that, "[a]ppellant may have failed to seek psychiatric treatment

for his mental condition, but it is a questionable practice to chastise one with a

mental impairment for the exercise of poor judgment in seeking rehabilitation."

100 F.3d 1462, 2465 (9th Cir. 1996) (citing *Blankenship v. Bowen*, 874 F.2d 1116,

1124 (6th Cir. 1989)). Taken together, these cases simply suggest that whether the

ALJ's finding is appropriate depends on the facts of the case.

Here, the ALJ's finding is not legitimate because it is based on an

incomplete reading of the record. For example, the ALJ cites to Dr. Heistand's

notes from September 2012, when Dr. Heistand documented Hangsleben's missed

appointments and failure to complete homework. (AR 840.) That note also

includes the following language:

> Tamara clearly described her life being chaotic and spending time
> helping others in crisis when not following up on treatment for
> herself. . . . [H]er thinking was quite disorganized and she needed
> help to complete [worksheets]. . . . I told her I observed that she
> wanted to comp[l]ete homework and work on issues but that she had
> trouble putting her care and treatment as a priority in her life. . . .
> [She] came a bit late and was disheveled with stains on her shirt. . . .
> She seems to have significant problems managing her time and
> energy. She seems open to feedback but it is unclear whether she is
> able to organize her thoughts and time to complete the work
> necessary for [cognitive processing therapy].

-24-

(AR 840.) Although the ALJ may have been correct that Hangsleben lacked motivation to improve her mental health conditions, the Court cannot understand how such a finding makes Hangsleben's descriptions of her anxiety and panic attacks less credible, particularly when Dr. Heistand's notes make clear that Hangsleben's lack of motivation is directly tied to her mental health issues. Hangsleben may not be the most reliable narrator, but her unreliability appears to go hand-in-hand with her diagnoses. Further, the ALJ's role in evaluating Hangsleben's testimony was limited to determine whether her allegations of specific symptoms were credible, not whether she was generally believable. *Holohan*, 246 F.3d at 1208.

The ALJ failed to give specific and legitimate reasons supported by substantial evidence to reject Hangsleben's testimony. On remand, the ALJ must incorporate Hangsleben's testimony into her decision.

## III.    Residual Functional Capacity Determination

Hangsleben argues that the ALJ's finding regarding her RFC is neither complete nor supported by substantial evidence. More specifically, Hangsleben argues that, in addition to refusing to incorporate the opinion evidence of Hangsleben's treating physicians, the ALJ erred in determining Hangsleben's physical and mental limitations.

-25-

Regarding her physical limitations, Hangsleben argues that the ALJ should

not have relied on Dr. Platter's assessment of her lifting and carrying limitations

because it was based on an incomplete review of her medical history. The ALJ

wrote that "Dr. Platter summarized the medical and non-medical evidence use to

form his opinion, including imaging studies and the claimant's self-described

activities of daily living." (AR 34.) Although Dr. Platter did not have Dr. Ready's

opinion before him when he completed his assessment, he appears to have had an

otherwise complete review of Hangsleben's medical record. As addressed above,

the ALJ did not err in partially rejecting Dr. Ready's opinion of Hangsleben's

limitations as inadequately supported. The Court cannot find that Dr. Platter

should have incorporated Dr. Ready's assessment where the ALJ appropriately

partially rejected the same assessment. However, on remand, the ALJ must

consider Hangsleben's allegations of neck pain and determine whether Dr.

Platter's assessment is consistent with her testimony.

Hangsleben also argues that the ALJ erred in failing to include manipulative

limitations in her RFC finding. Hangsleben testified that she had carpal tunnel

syndrome which prevented her from playing the piano. The record includes test

results, summarized by a pain specialist, summarizing the findings of a nerve

conduction test as consistent with carpal tunnel syndrome. The ALJ did not

address Hangsleben's alleged carpal tunnel syndrome anywhere in her decision. The Court's role is not to sort through the medical data, and it cannot determine whether and to what extent the appropriate RFC finding should incorporate manipulative limitations. However, as discussed above, the ALJ may not discredit a claimant's subjective testimony regarding her symptoms without: (1) considering whether Hangsleben showed signs of malingering; (2) considering whether her testimony was supported by substantial evidence; and (3) stating and appropriately supporting legitimate reasons for rejecting Hangsleben's testimony. *Lingenfelter*, 504 F.3d at 1036. On remand, the ALJ must remedy this error.

Hangsleben further argues that the mental limitations factored into the ALJ's findings were incomplete and inaccurate. She claims that the limitations are incomplete because they did not consider Dr. van Dam's assessment of Hangsleben as experiencing "occasional lapses in concentration and work attendance when depressive symptoms worsen." (AR 149.) Hangsleben asserts that the limitations are inaccurate because the ALJ's finding that she has moderate difficulties in concentration, persistence, or pace is inconsistent with her determination that Hangsleben is capable of "simple, routine tasks involving simple work-related decisions." (AR 29.)

The ALJ failed to consider all of the relevant evidence in determining

Hangsleben's mental limitations. As analyzed above, the ALJ erred in rejecting

Dr. McCollum's opinion of Hangsleben's cognitive, social, and emotional

limitations. Additionally, the ALJ erroneously claimed to have fully incorporated

the opinion of Dr. van Dam, the state-employed non-treating physician. However,

the ALJ only incorporated Dr. van Dam's opinion that Hangsleben was less

limited than Dr. McCollum had determined. Notably absent from the ALJ's

decision is Dr. van Dam's opinion that Hangsleben may suffer occasional lapses in

attention and work attendance.[9]  This was error. On remand, the ALJ must

consider not only Dr. McCollum's assessed limitations but also Dr. van Dam's

opinion that occasionally Hangsleben will not be present mentally or physically.

Finally, Hangsleben argues that the ALJ erred in failing to factor into the

RFC Dr. van Dam's opinion that Hangsleben experiences moderate difficulties in

concentration, persistence, or pace. The ALJ determined that she had

appropriately considered this opinion by limiting Hangsleben to "performing

simple, routine tasks involving simple work-related decisions with few changes to

the work setting." Had the ALJ appropriately discredited Dr. McCollum's

---

[9] Hangsleben argues that the word "occasional" has a specific meaning within Social Security Ruling 83-10 which should control here. However, the parties have not addressed whether a state-employed physician's use of the word "occasional" necessarily carries the same meaning as it does under SSR 83-10. In any event, the ALJ must carefully consider Dr. van Dam's opinion on remand.

-28-

opinion, this would not have been error because the ALJ's assessment was "consistent with restrictions identified in the medical testimony"—namely, with Dr. van Dam's opinion that Hangsleben's "overall presentation would warrant simple, repetitive activity." (AR 150.) *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). However, because the ALJ erred in discrediting Dr. McCollum's opinion, the ALJ must reconsider whether and to what extent Hangsleben's cognitive limitations factor into the RFC finding on remand.

## IV. Vocational Expert's Testimony

Hangsleben further argues that the ALJ erred in failing to resolve apparent conflicts between the vocational expert ("VE")'s testimony and the Dictionary of Occupational Titles ("DOT"). There is no dispute that the VE's testimony was inconsistent with the DOT.[10] Instead, the issue is whether the ALJ, rather than Hangsleben's own attorney, had the burden of seeking clarification.

Pursuant to SSR 00-4p, "the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." Where a "possible conflict" appears, the ALJ must seek

---

[10] The VE testified that Hangsleben was capable of performing the jobs of cannery worker and small products assembly, both of which require "constant reaching," and that of laundry folder, which requires "frequent reaching." As discussed earlier, however, Hangsleben was limited to occasional reaching overhead and bi-laterally. Additionally, the VE testified that Hangsleben could perform work requiring the ability to follow "detailed" job instructions, but Hangsleben was limited to "simple, routine tasks."

clarification in two ways. First, she must "[a]sk the VE . . . if the evidence he or

she has provided conflicts with information provided in the DOT." SSR 00-4p.

Second, "[i]f the VE's . . . evidence appears to conflict with the DOT, the

adjudicator will obtain a reasonable explanation for the apparent conflict." *Id.*

The ALJ asked only the first question. Although the VE testified that there was no

conflict, there was a conflict. Thus, the ALJ erred in not asking further questions.

Even if the ALJ reasonably believed that there was no conflict at the time of

the hearing, she would not have been alleviated of her burden of resolution. SSR

00-4p is not subtle on this point:

> When vocational evidence provided by a VE . . . is not consistent
> with information in the DOT, the adjudicator must resolve this
> conflict before relying on the VE evidence to support a determination
> or decision that the individual is or is not disabled. The adjudicator
> will explain in the determination or decision how he or she resolved
> the conflict. The adjudicator must explain the resolution of the
> conflict irrespective of how the conflict was identified.

The fact of a conflict between the DOT and the VE's testimony does not, in and of

itself, constitute error. Rather, the error is procedural. The ALJ erred in failing to

clarify and resolve the conflict between the VE's testimony and the DOT. On

remand, the ALJ must address the apparent conflict.

## V. Disposition

Courts reviewing Social Security proceedings "have the power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 402 U.S.C. § 405.

Under the "credit-as-true rule," medical opinions and claimant testimony are understood as true "where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the [opinion or testimony] were credited." *Garrison*, 759 P.3d at 1019 (citation and internal quotation marks omitted). The Ninth Circuit has developed a three-part test for district courts to apply in determining whether to remand for further fact-finding or to remand for calculation and award of benefits. The district court must remand to the ALJ with instructions to calculate and award benefits if: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id.* at 1020. When all three prongs are satisfied, the district court abuses its discretion by failing to remand for an award of benefits. *Id.*

Here, the Court must remand for further proceedings rather than for the calculation and award of benefits. The first prong of the credit-as-true test is not met. The record is insufficiently developed, as there is conflicting evidence regarding the severity of Hangsleben's mental, social, and physical limitations. For example, it is unclear how much work Hangsleben is likely to miss due to her panic attacks. On remand, the ALJ will have the opportunity to further develop the record to determine the severity of Hangsleben's impairments and to properly assess Hangsleben's RFC. Because the Court determines that "there are outstanding issues require resolution," it does not reach the second and third prongs of the test. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th Cir. 2014).

In summary, on remand, the ALJ must: (1) appropriately credit Dr. McCollum's opinion; (2) appropriately credit Hangsleben's testimony regarding her symptoms; (3) correct the errors in the RFC; and (4) properly resolve any conflict that arises between the DOT and VE evidence.

There being no additional objections and no clear error in the remainder of Judge Lynch's Findings and Recommendation,

IT IS ORDERED that Judge Lynch's Findings and Recommendation (Doc. 16) are ADOPTED in part and REJECTED in part. The Commissioner's decision

is REVERSED, and Hangsleben's application for Social Security benefits and insurance is REMANDED to the agency for further proceedings consistent with this Order.

Dated this 27th day of September, 2016.

Dana L. Christensen, Chief Judge
United States District Court